# GARDNER *v.* FLORIDA

No. 74–6593.   Argued November 30, 1976—Decided March 22, 1977

STEVENS, J., announced the Court's judgment and filed an opinion, in which STEWART and POWELL, JJ., joined. BURGER, C. J., concurred in the judgment. WHITE, J., *post*, p. 362, and BLACKMUN, J., *post*, p. 364, filed opinions concurring in the judgment. BRENNAN, J., filed a separate

opinion, *post*, p. 364. MARSHALL, J., *post*, p. 365, and REHNQUIST, J., *post*, p. 371, filed dissenting opinions.

*Charles H. Livingston* argued the cause for petitioner. With him on the briefs were *James A. Gardner, Jack Greenberg, James M. Nabrit III, Peggy C. Davis,* and *Anthony G. Amsterdam.*

*Wallace E. Allbritton,* Assistant Attorney General of Florida, argued the cause for respondent. With him on the brief was *Robert L. Shevin,* Attorney General.

MR. JUSTICE STEVENS announced the judgment of the Court and delivered an opinion, in which MR. JUSTICE STEWART and MR. JUSTICE POWELL joined.

Petitioner was convicted of first-degree murder and sentenced to death. When the trial judge imposed the death sentence he stated that he was relying in part on information in a presentence investigation report. Portions of the report were not disclosed to counsel for the parties. Without reviewing the confidential portion of the presentence report, the Supreme Court of Florida, over the dissent of two justices, affirmed the death sentence. 313 So. 2d 675 (1975). We conclude that this procedure does not satisfy the constitutional command that no person shall be deprived of life without due process of law.

I

On June 30, 1973, the petitioner assaulted his wife with a blunt instrument, causing her death. On January 10, 1974, after a trial in the Circuit Court of Citrus County, Fla., a jury found him guilty of first-degree murder.

The separate sentencing hearing required by Florida law in capital cases [1] was held later on the same day. The State merely introduced two photographs of the decedent, otherwise

---

[1] Fla. Stat. Ann. § 921.141 (Supp. 1976). This Court upheld the constitutionality of the statute in *Proffitt* v. *Florida,* 428 U. S. 242.

relying on the trial testimony. That testimony, if credited, was sufficient to support a finding of one of the statutory aggravating circumstances, that the felony committed by petitioner "was especially heinous, atrocious, or cruel." [2]

In mitigation petitioner testified that he had consumed a vast quantity of alcohol during a day-long drinking spree which preceded the crime, and professed to have almost no recollection of the assault itself. His testimony, if credited, was sufficient to support a finding of at least one of the statutory mitigating circumstances. [3]

After hearing this evidence the jury was instructed to determine by a majority vote (1) whether the State had proved one of the aggravating circumstances defined by statute, (2) whether mitigating circumstances outweighed any such aggravating circumstance, and (3) based on that determination, whether the defendant should be sentenced to life or death.

After the jury retired to deliberate, the judge announced that he was going to order a presentence investigation of petitioner. [4] Twenty-five minutes later the jury returned its advisory verdict. It expressly found that the mitigating cir-

---

[2] Fla. Stat. Ann. § 921.141 (5) (h) (Supp. 1976).

[3] The statute provides, in part:

"(6) Mitigating circumstances.—Mitigating circumstances shall be the following:

. . . . .

"(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.

. . . . .

"(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." Fla. Stat. Ann. §§ 921.141 (6) (b), (f) (Supp. 1976).

[4] Florida Rules Crim. Proc. 3.710–3.713 authorize the presentence investigation. The Rules apply to all cases in which the trial court has discretion in sentencing, and make no reference to the special capital-sentencing procedure at issue here.

cumstances outweighed the aggravating circumstances and advised the court to impose a life sentence. App. 131.

The presentence investigation report was completed by the Florida Parole and Probation Commission on January 28, 1974. On January 30, 1974, the trial judge entered findings of fact and a judgment sentencing petitioner to death. His ultimate finding was that the felony "was especially heinous, atrocious or cruel; and that such aggravating circumstances outweighs the mitigating circumstance, to-wit: none." *Id.*, at 138. As a preface to that ultimate finding, he recited that his conclusion was based on the evidence presented at both stages of the bifurcated proceeding, the arguments of counsel, and his review of "the factual information contained in said pre-sentence investigation." *Ibid.*

There is no dispute about the fact that the presentence investigation report contained a confidential portion which was not disclosed to defense counsel. Although the judge noted in his findings of fact that the State and petitioner's counsel had been given "a copy of that portion [of the report] to which they are entitled," *ibid.*, counsel made no request to examine the full report or to be apprised of the contents of the confidential portion. The trial judge did not comment on the contents of the confidential portion. His findings do not indicate that there was anything of special importance in the undisclosed portion, or that there was any reason other than customary practice for not disclosing the entire report to the parties.

On appeal to the Florida Supreme Court, petitioner argued that the sentencing court had erred in considering the presentence investigation report, including the confidential portion, in making the decision to impose the death penalty. The *per curiam* opinion of the Supreme Court did not specifically discuss this contention, but merely recited the trial judge's finding, stated that the record had been carefully reviewed, and concluded that the conviction and sentence should be

affirmed. The record on appeal, however, did not include the confidential portion of the presentence report.

Justice Ervin and Justice Boyd dissented on several grounds. They regarded the evidence as sufficient to establish a mitigating circumstance as a matter of law, and also concluded that it was fundamental error for the trial judge to rely on confidential matter not provided to the parties. They stated, in part:

"Additionally, it appears from the record that there was a 'confidential' portion of the PSI report made available to the trial judge *which was not provided to either Appellant or Appellee.* In fact, it is unclear from the record whether this Court has been provided the 'confidential' portion thereof for our review, a critical final step between conviction and imposition of the death penalty—one of the safeguards outlined in *Dixon.* [*State v. Dixon,* 283 So. 2d 1 (1973).] What evidence or opinion was contained in the 'confidential' portion of the report is purely conjectural and absolutely unknown to and therefore unrebuttable by Appellant. We have no means of determining on review what role such 'confidential' information played in the trial judge's sentence, and thus I would overturn Appellant's death sentence on the basis of this fundamental error alone." 313 So. 2d, at 678 (emphasis in original).

Petitioner's execution was stayed pending determination of the constitutionality of the Florida capital-sentencing procedure. Following the decision in *Proffitt* v. *Florida,* 428 U. S. 242, holding that the Florida procedure, on its face, avoids the constitutional deficiencies identified in *Furman* v. *Georgia,* 408 U. S. 238, the Court granted certiorari in this case, 428 U. S. 908, to consider the constitutionality of the trial judge's use of a confidential presentence report in this capital case.[5]

---

[5] In an appendix to its brief in this Court, the State has printed a copy of the confidential portion of the presentence report. Petitioner contests

## II

The State places its primary reliance on this Court's landmark decision in *Williams* v. *New York,* 337 U. S. 241. In that case, as in this, the trial judge rejected the jury's recommendation of mercy and imposed the death sentence in reliance, at least in part, on material contained in a report prepared by the court's probation department. The New York Court of Appeals had affirmed the sentence, rejecting the contention that it was a denial of due process to rely on information supplied by witnesses whom the accused could neither confront nor cross-examine.

This Court referred to appellant's claim as a "narrow contention," *id.,* at 243, and characterized the case as one which

> "presents a serious and difficult question . . . relat[ing] to the rules of evidence applicable to the manner in which a judge may obtain information to guide him in the imposition of sentence upon an already convicted defendant." *Id.,* at 244.

The conviction and sentence were affirmed, over the dissent of two Justices.

Mr. Justice Black's opinion for the Court persuasively reasons why material developed in a presentence investigation may be useful to a sentencing judge, and why it may not be

---

its authenticity. He also argues, alternatively, that we should not review its contents because it was not made a part of the certified record in the state courts or in this Court; that consideration of the contents of the report in the first instance in this Court flouts the procedural regularity mandated for capital sentencing by *Furman* v. *Georgia,* 408 U. S. 238, and *Proffitt* v. *Florida;* or that, not having had an opportunity to present evidence to rebut the confidential portion of the report, it would be unfair and improper to require him to address its contents in this Court. Reply Brief for Petitioner 2–3.

It is not a function of this Court to evaluate in the first instance the possibly prejudicial impact of facts and opinions appearing in a presentence report. We therefore do not consider the contents of the appendix to the State's brief.

unfair to a defendant to rely on such information even if it would not be admissible in a normal adversary proceeding in open court. We consider the relevance of that reasoning to this case in Part III of this opinion. Preliminarily, however, we note two comments by Mr. Justice Black that make it clear that the *holding* of *Williams* is not directly applicable to this case.

It is first significant that in *Williams* the material facts concerning the defendant's background which were contained in the presentence report were described in detail by the trial judge in open court. Referring to this material, Mr. Justice Black noted:

> "The accuracy of the statements made by the judge as to appellant's background and past practices was not challenged by appellant or his counsel, nor was the judge asked to disregard any of them or to afford appellant a chance to refute or discredit any of them by cross-examination or otherwise." *Ibid.*

In contrast, in the case before us, the trial judge did not state on the record the substance of any information in the confidential portion of the presentence report that he might have considered material.[6] There was, accordingly, no similar opportunity for petitioner's counsel to challenge the accuracy or materiality of any such information.

It is also significant that Mr. Justice Black's opinion recognized that the passage of time justifies a re-examination of capital-sentencing procedures. As he pointed out:

> "This whole country has traveled far from the period in which the death sentence was an automatic and com-

---

[6] In fact, the only reference in the record to the confidential portion was the inference to be drawn from the ambiguous mention of the " 'portion . . . to which they are entitled,' " *supra*, at 353, in the judge's written findings of fact issued on the day sentence was announced.

monplace result of convictions—even for offenses today deemed trivial." *Id.*, at 247–248.

Since that sentence was written almost 30 years ago, this Court has acknowledged its obligation to re-examine capital-sentencing procedures against evolving standards of procedural fairness in a civilized society.[7]

### III

In 1949, when the *Williams* case was decided, no significant constitutional difference between the death penalty and lesser punishments for crime had been expressly recognized by this Court. At that time the Court assumed that after a defendant was convicted of a capital offense, like any other offense, a trial judge had complete discretion to impose any sentence within the limits prescribed by the legislature.[8] As long as the judge stayed within those limits, his sentencing discretion was essentially unreviewable and the possibility of error was remote, if, indeed, it existed at all. In the intervening years there have been two constitutional developments which require us to scrutinize a State's capital-sentencing procedures more closely than was necessary in 1949.

First, five Members of the Court have now expressly recognized that death is a different kind of punishment from any other which may be imposed in this country. *Gregg* v. *Georgia*, 428 U. S. 153, 181–188 (opinion of STEWART, POWELL, and STEVENS, JJ.); see *id.*, at 231–241 (MARSHALL, J., dissenting); *Furman* v. *Georgia*, 408 U. S., at 286–291 (BRENNAN, J., concurring), 306–310 (STEWART, J., concurring); see *id.*, at 314–371 (MARSHALL, J., concurring). From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the

---

[7] *Gregg* v. *Georgia*, 428 U. S. 153, 171–173, 179–181; *Furman* v. *Georgia*, *supra*, at 299–300 (BRENNAN, J., concurring); *McGautha* v. *California*, 402 U. S. 183, 197–203; *Witherspoon* v. *Illinois*, 391 U. S. 510, 519 n. 15.

[8] See *Williams* v. *New York*, 337 U. S. 241, 251–252.

sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

Second, it is now clear that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause. Even though the defendant has no substantive right to a particular sentence within the range authorized by statute, the sentencing is a critical stage of the criminal proceeding at which he is entitled to the effective assistance of counsel. *Mempa* v. *Rhay,* 389 U. S. 128; *Specht* v. *Patterson,* 386 U. S. 605. The defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence even if he may have no right to object to a particular result of the sentencing process. See *Witherspoon* v. *Illinois,* 391 U. S. 510, 521–523.[9]

In the light of these developments we consider the justifications offered by the State for a capital-sentencing procedure which permits a trial judge to impose the death sentence on the basis of confidential information which is not disclosed to the defendant or his counsel.

The State first argues that an assurance of confidentiality to potential sources of information is essential to enable investigators to obtain relevant but sensitive disclosures from persons unwilling to comment publicly about a defendant's

---

[9] The fact that due process applies does not, of course, implicate the entire panoply of criminal trial procedural rights.

"Once it is determined that due process applies, the question remains what process is due. It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands. . . . Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure." *Morrissey* v. *Brewer,* 408 U. S. 471, 481.

background or character. The availability of such information, it is argued, provides the person who prepares the report with greater detail on which to base a sentencing recommendation and, in turn, provides the judge with a better basis for his sentencing decision. But consideration must be given to the quality, as well as the quantity, of the information on which the sentencing judge may rely. Assurances of secrecy are conducive to the transmission of confidences which may bear no closer relation to fact than the average rumor or item of gossip, and may imply a pledge not to attempt independent verification of the information received. The risk that some of the information accepted in confidence may be erroneous, or may be misinterpreted, by the investigator or by the sentencing judge, is manifest.

If, as the State argues, it is important to use such information in the sentencing process, we must assume that in some cases it will be decisive in the judge's choice between a life sentence and a death sentence. If it tends to tip the scales in favor of life, presumably the information would be favorable and there would be no reason why it should not be disclosed. On the other hand, if it is the basis for a death sentence, the interest in reliability plainly outweighs the State's interest in preserving the availability of comparable information in other cases.

The State also suggests that full disclosure of the presentence report will unnecessarily delay the proceeding. We think the likelihood of significant delay is overstated because we must presume that reports prepared by professional probation officers, as the Florida procedure requires, are generally reliable.[10] In those cases in which the accuracy of a report is contested, the trial judge can avoid delay by disregarding

_____

[10] Our presumption that the reports are normally reliable is, of course, not inconsistent with our concern about the possibility that critical unverified information may be inaccurate and determinative in a particular case.

the disputed material. Or if the disputed matter is of critical importance, the time invested in ascertaining the truth would surely be well spent if it makes the difference between life and death.

The State further urges that full disclosure of presentence reports, which often include psychiatric and psychological evaluations, will occasionally disrupt the process of rehabilitation. The argument, if valid, would hardly justify withholding the report from defense counsel. Moreover, whatever force that argument may have in noncapital cases, it has absolutely no merit in a case in which the judge has decided to sentence the defendant to death. Indeed, the extinction of all possibility of rehabilitation is one of the aspects of the death sentence that makes it different in kind from any other sentence a State may legitimately impose.

Finally, Florida argues that trial judges can be trusted to exercise their discretion in a responsible manner, even though they may base their decisions on secret information. However acceptable that argument might have been before *Furman* v. *Georgia,* it is now clearly foreclosed.[11] Moreover, the argument rests on the erroneous premise that the participation of counsel is superfluous to the process of evaluating the relevance and significance of aggravating and mitigating facts. Our belief that debate between adversaries is often essential to the truth-seeking function of trials requires us also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases.

Even if it were permissible to withhold a portion of the report from a defendant, and even from defense counsel, pursuant to an express finding of good cause for nondisclosure, it

---

[11] *Furman* v. *Georgia,* 408 U. S., at 313–314 (WHITE, J., concurring). This argument is inconsistent with the basis upon which the Florida capital-sentencing procedure was upheld, *Proffitt* v. *Florida,* 428 U. S., at 254.

would nevertheless be necessary to make the full report a part of the record to be reviewed on appeal. Since the State must administer its capital-sentencing procedures with an even hand, see *Proffitt* v. *Florida,* 428 U. S., at 250–253, it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed. Without full disclosure of the basis for the death sentence, the Florida capital-sentencing procedure would be subject to the defects which resulted in the holding of unconstitutionality in *Furman* v. *Georgia.*[12] In this particular case, the only explanation for the lack of disclosure is the failure of defense counsel to request access to the full report. That failure cannot justify the submission of a less complete record to the reviewing court than the record on which the trial judge based his decision to sentence petitioner to death.

Nor do we regard this omission by counsel as an effective waiver of the constitutional error in the record. There are five reasons for this conclusion. First, the State does not urge that the objection has been waived. Second, the Florida Supreme Court has held that it has a duty to consider "the total record," *Swan* v. *State,* 322 So. 2d 485, 489 (1975), when it reviews a death sentence. Third, since two members of that court expressly considered this point on the appeal in this case, we presume that the entire court passed on the question. Cf. *Boykin* v. *Alabama,* 395 U. S. 238, 240–242, and n. 3. Fourth, there is no basis for presuming that the defendant himself made a knowing and intelligent waiver, or that counsel could possibly have made a tactical decision not to examine the full report. Cf. *Estelle* v. *Williams,* 425 U. S.

---

[12] The Supreme Court of Florida decided petitioner's case before our decision in *Proffitt* v. *Florida, supra,* and before its own consideration of *Proffitt,* 315 So. 2d 461 (1975), or of *Tedder* v. *State,* 322 So. 2d 908 (1975). Therefore, we cannot join MR. JUSTICE MARSHALL's criticism of the Florida courts for their failure to follow the teaching of those cases.

501, 507–508. Fifth, since the judge found, in disagreement with the jury, that the evidence did not establish any mitigating circumstance, and since the presentence report was the only item considered by the judge but not by the jury, the full review of the factual basis for the judge's rejection of the advisory verdict is plainly required. For if the jury, rather than the judge, correctly assessed the petitioner's veracity, the death sentence rests on an erroneous factual predicate.

We conclude that petitioner was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain.

## IV

There remains only the question of what disposition is now proper. Petitioner's conviction, of course, is not tainted by the error in the sentencing procedure. The State argues that we should merely remand the case to the Florida Supreme Court with directions to have the entire presentence report made a part of the record to enable that court to complete its reviewing function. That procedure, however, could not fully correct the error. For it is possible that full disclosure, followed by explanation or argument by defense counsel, would have caused the trial judge to accept the jury's advisory verdict. Accordingly, the death sentence is vacated, and the case is remanded to the Florida Supreme Court with directions to order further proceedings at the trial court level not inconsistent with this opinion.

*Vacated and remanded.*

THE CHIEF JUSTICE concurs in the judgment.

MR. JUSTICE WHITE, concurring in the judgment.

In *Woodson* v. *North Carolina,* 428 U. S. 280 (1976), the Court addressed the question whether the mandatory death penalty imposed under the statute involved in that case was

consistent with the *Eighth Amendment's* prohibition against cruel and unusual punishments.. The plurality opinion stated:

> "The issue, like that explored in *Furman,* involves the *procedure* employed by the State to select persons for the unique and irreversible penalty of death." *Id.,* at 287. (Emphasis added.)

In holding that the failure to conduct the sort of post-trial sentencing proceeding which Florida law requires, and which was conducted in this case, rendered North Carolina's mandatory death penalty statute unconstitutional, the plurality said:

> "[W]e believe that in *capital cases* the fundamental respect for humanity underlying the *Eighth Amendment,* see *Trop* v. *Dulles,* 356 U. S. [86,] 100 (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the *process* of inflicting the penalty of death.
>
> "This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference *in the need for reliability in the determination that death is the appropriate punishment in a specific case."* *Id.,* at 304–305. (Emphasis added.)

The issue in this case, like the issue in *Woodson* v. *North Carolina, supra,* "involves the procedure" employed by the State in selecting persons who will receive the death penalty. Here the sentencing judge indicated that he selected petitioner Gardner for the death penalty in part because of information contained in a presentence report which information was not

disclosed to petitioner or to his counsel and to which petitioner had no opportunity to respond. A procedure for selecting people for the death penalty which permits consideration of such secret information relevant to the "character and record of the individual offender," *id.*, at 304, fails to meet the "need for reliability in the determination that death is the appropriate punishment" which the Court indicated was required in *Woodson, supra,* at 305. This conclusion stems solely from the Eighth Amendment's ban on cruel and unusual punishments on which the *Woodson* decision expressly rested, and my conclusion is limited, as was *Woodson,* to cases in which the death penalty is imposed. I thus see no reason to address in this case the possible application to sentencing proceedings—in death or other cases—of the Due Process Clause, other than as the vehicle by which the strictures of the Eighth Amendment are triggered in this case. For these reasons, I do not join the plurality opinion but concur in the judgment.

MR. JUSTICE BLACKMUN, concurring in the judgment.

Given the judgments of the Court in *Woodson* v. *North Carolina,* 428 U. S. 280 (1976), and in *Roberts* v. *Louisiana,* 428 U. S. 325 (1976),* each attained by a plurality opinion of JUSTICES STEWART, POWELL, and STEVENS, in combination with respective concurrences in the judgment by JUSTICES BRENNAN and MARSHALL, I concur in the judgment the Court reaches in the present case.

MR. JUSTICE BRENNAN.

I agree for the reasons stated in the plurality opinion that the Due Process Clause of the Fourteenth Amendment is violated when a defendant facing a death sentence is not informed of the contents of a presentence investigation report made to the sentencing judge. However, I adhere to my

---

*See also *Proffitt* v. *Florida,* 428 U. S. 242 (1976); *Jurek* v. *Texas,* 428 U. S. 262 (1976); and *Gregg* v. *Georgia,* 428 U. S. 153 (1976).

view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia,* 428 U. S. 153, 227 (1976) (BRENNAN, J., dissenting). I therefore would vacate the death sentence, and I dissent from the Court's judgment insofar as it remands for further proceedings that could lead to its imposition.

MR. JUSTICE MARSHALL dissenting.

Last Term, this Court carefully scrutinized the Florida procedures for imposing the death penalty and concluded that there were sufficient safeguards to insure that the death sentence would not be "wantonly" and "freakishly" imposed. *Proffitt* v. *Florida,* 428 U. S. 242 (1976). This case, however, belies that hope. While I continue to believe that the death penalty is unconstitutional in all circumstances, see *Furman* v. *Georgia,* 408 U. S. 238, 314 (1972) (MARSHALL, J., concurring); *Gregg* v. *Georgia,* 428 U. S. 153, 231 (1976) (MARSHALL, J., dissenting), and therefore would remand this case for resentencing to a term of life, nevertheless, now that Florida may legally take a life, we must insist that it be in accordance with the standards enunciated by this Court. In this case I am appalled at the extent to which Florida has deviated from the procedures upon which this Court expressly relied. It is not simply that the trial judge, in overriding the jury's recommendation of life imprisonment, relied on undisclosed portions of the presentence report. Nor is it merely that the Florida Supreme Court affirmed the sentence without discussing the omission and without concern that it did not even have the entire report before it. Obviously that alone is enough to deny due process and require that the death sentence be vacated as the Court now holds. But the blatant disregard exhibited by the courts below for the standards devised to regulate imposition of the death penalty calls into question the very basis for this Court's approval of that system in *Proffitt*.

In *Proffitt* v. *Florida, supra,* this Court gave its approval to the new death penalty statute of Florida, but very carefully spelled out its reasons for doing so. The joint opinion of JUSTICES STEWART, POWELL, and STEVENS (hereafter joint opinion) noted in particular that "[t]he Florida Supreme Court has stated . . . that '[i]n order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ,' *Tedder* v. *State,* 322 So. 2d 908, 910 (1975)," 428 U. S., at 249, and that the Florida "statute requires that if the trial court imposes a sentence of death, 'it shall set forth in writing its findings upon which the sentence of death is based as to the facts: (a) [t]hat sufficient [statutory] aggravating circumstances exist . . . and (b) [t]hat there are insufficient [statutory] mitigating circumstances . . . to outweigh the aggravating circumstances.' [Fla. Stat. Ann.] § 921.141 (3) (Supp. 1976–1977)." *Id.,* at 250. In addition, the joint opinion, concerned that Florida provided no "specific form of review," found assurance in the fact that

> "[s]ince, however, the trial judge must justify the imposition of death sentence with written findings, meaningful appellate review of each such sentence is made possible, and the Supreme Court of Florida, like its Georgia counterpart, considers its function to be to '[guarantee] that the [*aggravating and mitigating*] *reasons present in one case will reach a similar result to that reached under similar circumstances in another case.* . . . If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great.' *State* v. *Dixon,* 283 So. 2d 1, 10 (1973)." *Id.,* at 251. (Emphasis added.)

After studying the performance of the Florida Supreme Court in reviewing death cases, this Court satisfied itself that these guarantees were genuine and that "the Florida court has under-

taken responsibly to perform its function of death sentence review with a maximum of rationality and consistency," *id.,* at 258–259, and "has in effect adopted the type of proportionality review mandated by the Georgia statute" upheld in *Gregg* v. *Georgia, supra.* 428 U. S., at 259. The joint opinion placed great emphasis on this factor, reasoning that "because of its statewide jurisdiction, [the Florida Supreme Court] can assure consistency, fairness, and rationality in the evenhanded operation of the state law." *Id.,* at 259–260.

In the present case, however, the Florida Supreme Court engaged in precisely the "cursory or rubber-stamp review" that the joint opinion in *Proffitt* trusted would not occur. *Id.,* at 259. The jury, after considering the evidence, recommended a life sentence:

> "We, the Jury, have heard evidence, under the sentencing procedure in the above cause, as to whether aggravating circumstances which were so defined in the Court's charge, existed in the capital offense here involved, and whether sufficient mitigating circumstances are defined in the Court's charge to outweigh such aggravating circumstances, do find and advise that the mitigating circumstances do outweigh the aggravating circumstances.
>
> "We therefore advise the Court that *a life* sentence should be imposed herein upon the defendant by the Court." App. 131.

The judge, however, ignored the jury's findings. His statutorily required written findings consisted of:

> "[T]he undersigned concludes and determines that aggravating circumstances exist, to-wit: The capital felony was especially heinous, atrocious or cruel; and that such aggravating circumstances outweighs [*sic*] the mitigating circumstance, to-wit: none; and based upon the records of such trial and sentencing proceedings makes the following findings of facts, to-wit:

"1. That the victim died as a result of especially heinous, atrocious and cruel acts committed by the defendant, the nature and extent of which are reflected by the testimony of Dr. William H. Shutze, District Medical Examiner of the Fifth Judicial Circuit of the State of Florida, as follows: [followed by a list of 11 injuries to the deceased]." *Id.*, at 138–139.

The Florida Supreme Court affirmed with two justices dissenting. The *per curiam* consisted of a statement of the facts of the murder, a verbatim copy of the trial judge's "findings," a conclusion that no new trial was warranted, and the following "analysis":

"Upon considering all the mitigating and aggravating circumstances and careful review of the entire record in the cause, the trial court imposed the death penalty for the commission of the afore-described atrocious and heinous crime.

"Accordingly, the judgment and sentence of the Circuit Court are hereby affirmed.

"It is so ordered." 313 So. 2d 675 (1975).

From this quotation, which includes the entire legal analysis of the opinion, it is apparent that the State Supreme Court undertook none of the analysis it had previously proclaimed to be its duty. The opinion does not say that the Supreme Court evaluated the propriety of the death sentence. It merely says the trial judge did so. Despite its professed obligation to do so, the Supreme Court thus failed "to determine independently" whether death was the appropriate penalty. The Supreme Court also appears to have done nothing "to guarantee" consistency with other death sentences. Its opinion makes no comparison with the facts in other similar cases. Nor did it consider whether the trial judge was correct in overriding the jury's recommendation. There was no attempt to ascertain whether the evidence sustaining death was "so clear and convincing that virtually no

reasonable person could differ," *supra,* at 366. Indeed, it is impossible for me to believe that that standard can be met in this case.

As the plurality notes, *ante,* at 352, there are two mitigating factors that could apply to this case and apparently were found applicable by the jury: "The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance" and "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." Fla. Stat. Ann. §§ 921.141 (6)(b) and (f) (Supp. 1976). The purpose of these two categories is, as Justice Ervin observed in dissent below, " 'to protect that person who, while legally answerable for his actions, may be deserving of some mitigation of sentence because of his mental state.' [*State* v. *Dixon,* 283 So. 2d 1, 10 (1973)]." 313 So. 2d, at 679.

I agree with Justice Ervin that petitioner is such a person. It is undisputed that he had been drinking virtually the entire day and night prior to the killing. Both court-appointed psychiatrists found that petitioner was an alcoholic and that "had he not been under the influence of alcohol at the time of the alleged crime, he would have been competent, knowing right from wrong and being capable of adhering to the right." App. 11, 19. Furthermore, his actions after the murder—falling asleep with his wife's dead body, seeking his mother-in-law's help the next morning because his wife did not appear to be breathing properly, weeping when he realized she might be dead, and waiting for the police to come with no attempt to escape—are consistent with his being temporarily mentally impaired at the time of the crime. In light of these facts, it is not surprising that the jury found that the mitigating circumstances outweighed the aggravating.

Clearly, this is not a case where the evidence suggesting death is "so clear and convincing that virtually no reasonable person could differ." Had the Florida Supreme Court exam-

ined the evidence in the manner this Court trusted it would, I have no doubt that the jury recommendation of life imprisonment would have been reinstated. As Justice Ervin observed:

> "This was a crime of passion in a marital setting in which the excessive use of alcohol was a material factor resulting in the homicide. As I read our statutes, this type of crime does not merit the death penalty because the discretion exercised to impose that penalty here extends beyond the discretion the statutes repose in governmental officials for such purpose. I do not believe that the statutes contemplate that a crime of this nature is intended to be included in the heinous category warranting the death penalty. A drunken spree in which one of the spouses is killed traditionally has not resulted in the death penalty in this state." 313 So. 2d, at 679.

In *Proffitt,* a majority of this Court was led to believe that Florida had established capital-sentencing procedures that would "assure that the death penalty will not be imposed in an arbitrary or capricious manner." 428 U. S., at 253. This case belies that promise and suggests the need to reconsider that assessment.*

---

*The plurality responds, *ante,* at 361 n. 12, that it cannot criticize the Florida courts because the decision in petitioner's case preceded both our decision in, *Proffitt* and the Florida Supreme Court's decision in *Proffitt* and *Tedder.* It conveniently ignores the fact that petitioner's case came after several key Florida death penalty cases, most notably *State* v. *Dixon,* 283 So. 2d 1 (1973), in which the Florida Supreme Court "guaranteed" that its review would insure similar results in similar cases. *Proffitt* v. *Florida,* 428 U. S. 242, 251 (1976), quoting *State* v. *Dixon, supra,* at 10.

More significantly, however, the plurality does not so much as question the procedure followed here and does nothing to insure that Florida will not again condemn this man to die in blatant disregard of its own rules. Compliance with *Proffitt* requires that on remand the trial judge give full consideration to the mitigating circumstances in the case and, if he again

Mr. Justice Rehnquist, dissenting.

Had I joined the plurality opinion in last Term's *Woodson* v. *North Carolina,* 428 U. S. 280 (1976), I would join the concurring opinion of my Brother White in this case. But if capital punishment is not cruel and unusual under the Eighth and Fourteenth Amendments, as the Court held in that case, the use of particular sentencing procedures, never previously held unfair under the Due Process Clause, in a case where the death sentence is imposed cannot convert that sentence into a cruel and unusual punishment. The prohibition of the Eighth Amendment relates to the character of the punishment, and not to the process by which it is imposed. I would therefore affirm the judgment of the Supreme Court of Florida.

---

rejects the jury's recommendation of life imprisonment, his reasons " 'be so clear and convincing that virtually no reasonable person could differ.' " 428 U. S., at 249. On review, the Florida Supreme Court must evaluate the facts itself and perform the comparative analysis it failed to do previously. It may be that my Brothers in the majority believe these requirements to be so obvious as not to need mention. Nevertheless, where a man's life is at stake, such blind faith is just not enough even after the decision in *Proffitt.*