WISEMAN, J.,* Concurring and Dissenting.
I concur with the majority’s conclusion that there was no reversible error in the guilt phase portion of the trial. I also agree that portions of the prosecutor’s letter to Genny Rojas were “plainly improper.” (Maj. opn., ante, at p. 952.) I disagree, however, with the majority’s holding that the reading of the letter was harmless error. To be reversible error, there need only be a reasonable possibility that the jury would have returned a verdict of life without possibility of parole if the prosecutor had not improperly appealed to the jury’s passions. Based on this record, I cannot say there is no reasonable possibility. On the basis of this one issue, I would conclude the sentence of death must be reversed.
I fully recognize that many cases have held that a prosecutor’s argument, although emotional, does not cause the proceedings to cross over into the realm where emotion reigns over reason. (E.g., People v. Leonard (2007) 40 Cal.4th 1370, 1418 [58 Cal.Rptr.3d 368, 157 P.3d 973] [“ ‘Emotion must not reign over reason and, on objection, courts should guard against prejudicially emotional argument.’ ”].) Neither the cases cited by the parties nor any case I have located, however, contains anything similar to the prosecutor’s letter to Genny.
In numerous cases, this court has approved prosecutors’ penalty phase arguments that urged the jury to stand in the victims’ shoes and consider the *960 pain and fear felt by the victims and the years of life of which the victims were deprived. (E.g., People v. Slaughter (2002) 27 Cal.4th 1187, 1212 [120 Cal.Rptr.2d 477, 47 P.3d 262]; People v. Cole (2004) 33 Cal.4th 1158, 1233 [17 Cal.Rptr.3d 532, 95 P.3d 811]; People v. Chatman (2006) 38 Cal.4th 344, 388 [42 Cal.Rptr.3d 621, 133 P.3d 534].) In other cases, the court has approved penalty phase arguments urging the jury to consider the anguish felt by the victims’ families. (E.g., People v. Jackson (2009) 45 Cal.4th 662, 692 [88 Cal.Rptr.3d 558, 199 P.3d 1098].) The court has also approved penalty phase summations stating that all members of society are victims when a person is murdered and describing the jurors as the conscience of an injured society. (People v. Mendoza (2007) 42 Cal.4th 686, 706 [68 Cal.Rptr.3d 274, 171 P.3d 2].)
In none of those cases, however, did the prosecutors reach the emotional pitch the prosecutor attained in his letter in this case. No previous case has approved an argument in the form of an impassioned, imaginary letter to a child victim. The court has never found proper an invitation to jurors to adopt the victim posthumously and become her parents. Never before has the court found proper or harmless an argument that purports—using the first person plural—to speak for the jurors themselves, saying “[y]ou are a member of our family, those of us who have lived with you here in Department 32,” and “we will hold your torturers accountable” by imposing death. (Italics added.) In this case, the prosecutor’s argument not only undertook to replace the jurors’ reason with their emotions as adoptive “parents,” it also undertook to tell them in their own voices what their decision was. Because of the tactics of (1) telling the jurors that they not only should sympathize with the victim but that they were the victim’s parents, and (2) identifying the jurors with the prosecutor (“we”) and telling them we will impose death, the prosecutor’s letter is something new.
Case law makes it clear that emotion is relevant to a jury’s assessment of the suitability of the death penalty. {People v. Leonard, supra, 40 Cal.4th at p. 1418 [“ ‘emotion need not, indeed, cannot, be entirely excluded from the jury’s moral assessment’ ”].) We are confronted here with the rare situation in which the prosecutor’s penalty phase argument goes too far. It is essential that the point at which passion becomes excessive be real and enforceable, and enforced, not merely theoretical.
In my opinion, the prosecutor’s letter in this case crosses the line. This court’s discussion of a Texas case in People v. Robinson (2005) 37 Cal.4th 592 [36 Cal.Rptr.3d 760, 124 P.3d 363] is instructive. The Robinson court described Salazar v. State (Tex.Crim.App. 2002) 90 S.W.3d 330 as an “extreme example” of a “due process infirmity.” (Robinson, supra, at p. 652.) In Salazar, the prosecution introduced a 17-minute video montage of the *961 victim’s life, which included 140 photographs and was set to emotional music, including “My Heart Will Go On” by Celine Dion from the soundtrack of the film Titanic (20th Century Fox 1997). The Texas Court of Criminal Appeals reversed a lower court’s ruling that this presentation was admissible and remanded for an assessment of prejudice. The Texas court stated that “ ‘the punishment phase of a criminal trial is not a memorial service for the victim. What may be entirely appropriate eulogies to celebrate the life and accomplishments of a unique individual are not necessarily admissible in a criminal trial.’ ” (Robinson, supra, at p. 652.) After remand, the error was found prejudicial. (Id. at fn. 32.) The prosecutor’s letter in this case was argument, not evidence, but its purpose and effect were similar.
The situation in People v. Mendoza, supra, 42 Cal.4th at page 706, illustrates how the letter was excessively emotional. In Mendoza, the prosecutor stated in the penalty phase summation that people in society as a whole were victims of the murder. This court held that this was a proper argument about the harm to society done by the defendant. The prosecutor went on, however, to state that the jurors in particular were victims because the defendant burdened them with the difficult duty of deciding whether to impose death. This court held that it was improper to single out the jurors as especially victimized, but concluded that the trial court identified the error and gave an adequate curative instruction.
In this case, the prosecutor did not tell the jurors they were victims, but told them they were something perhaps even more emotionally powerful—the victim’s parents. The prosecutor did not merely ask the jurors to stand in the victim’s shoes or the victim’s family’s shoes. He informed the jurors that “we”—himself and the jury—were the victim’s parents by adoption. This is not a proper role for a juror to assume even in a death penalty case where appeals to emotion are appropriate. The reason why becomes obvious by simply looking to the prosecutor’s own words used when describing the role of a parent. He said, “Real parents who lose a child freak out. They lose their minds. They wear their child’s death on their sleeve as a badge. They never get over it. It alters their lives forever. They lose their marriages. They lose their jobs. They end up with alcohol problems. They commit suicide because, when you lose a child, you lose a part of you. That’s what being a parent is.” Despite defense counsel’s objections to the reading of the letter, the court gave no curative instruction except the general statement that the attorneys’ personal opinions were not relevant, which, as the majority holds, was insufficient.
The United States Supreme Court’s comment in Gardner v. Florida (1977) 430 U.S. 349, 358 [51 L.Ed.2d 393, 97 S.Ct. 1197], is relevant to our situation: “It is of vital importance to the defendant and to the community that *962 any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.” (Italics added.) A death sentence lacks the moral authority the community intends it to have if, because of a prosecutor’s overzealous evocation of the passion for retribution, the sentence appears not to have issued from the jurors’ reason. In this case, the prosecutor’s argument created a danger that the jury’s death verdict was not reached through reason but instead as a result of an overzealous desire to exact parental retribution.
I am aware that this court has held that retribution is a proper purpose for imposing the death penalty. (People v. Zambrano (2007) 41 Cal.4th 1082, 1178 [63 Cal.Rptr.3d 297, 163 P.3d 4], disapproved on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].) This does not mean, however, that there should be no limits on the amount or kinds of passion for retribution the prosecution is permitted to evoke. The combination of retribution as an acceptable purpose and emotion as an appropriate factor, without limits, has the potential to overwhelm reason.
On the subject of prejudice, what I have already said shows part of the reason the prosecutor’s erroneous use of the letter was not harmless. As the majority states, an exacting standard of harmless error review applies; There must be no reasonable possibility that the jury would have rendered a different penalty verdict absent the error, a standard equivalent to the beyond a reasonable doubt standard of Chapman v. California (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. (People v. Wallace (2008) 44 Cal.4th 1032, 1092 [81 Cal.Rptr.3d 651, 189 P.3d 911].) In my view, the extreme emotional nature of the letter makes it reasonably possible that the improper argument tipped the balance. The majority takes the position that the letter was not “central” to the prosecutor’ summation (maj. opn., ante, at p. 953). I respectfully disagree with this conclusion and, to the contrary, believe the letter likely was the most memorable part of the prosecutor’s summation. The prosecutor was an experienced attorney and used the letter as a very powerful strategy in a highly emotional case. It must have been obvious to the prosecutor that his use of the letter to Genny was having a major impact on the jury in light of the repetitive and impassioned nature of the defense objections to it.
The nature of Veronica Utilia Gonzales’s penalty phase defense, in my view, reinforces this conclusion. Gonzales wanted the jury to believe that Ivan was the actual killer and that she was a minor participant. She also wanted the jury to believe that her responsibility for failing to try to stop Ivan or get help for Genny was mitigated by battered woman syndrome, her own history of abuse as a child, posttraumatic stress disorder, and intoxication. *963 She wanted the jury to find that, because of these factors, even though her conduct still constituted first degree murder, life without parole would be an adequate punishment. Without the improper argument, it is reasonably possible that the jury could have accepted her contentions and concluded that she should receive life without possibility of parole.
The majority states that the facts were so horrible that the improper influence of the letter must have been of minor significance by comparison. (Maj. opn., ante, at p. 953.) This may well be so with respect to Gonzales’s guilt phase objectives, for the evidence that Gonzales was guilty on one or another of the theories of first degree murder presented by the prosecution was very powerful. At the penalty phase, however, matters were different. The jury could have concluded that, despite Gonzales’s guilt, it was likely that Ivan was the actual killer or that Gonzales’s culpability was lessened by the factors she presented, or both. It could have found that, under these circumstances, life without parole would be enough punishment. There is a reasonable possibility that this would have happened had the prosecutor not read the letter. This may not be reasonably probable because, for instance, there was evidence that Gonzales was dominant over Ivan. It is still reasonably possible, which is the standard we must apply.
The majority also states that a fife verdict was unlikely because “the defense at the penalty phase was hobbled by the fact that the adult family members asking the jury to spare defendant’s life were themselves complicit in Genny’s endangerment.” (Maj. opn., ante, at p. 954.) Without any doubt, the family members asking the jury to spare Gonzales’s life were not ideal witnesses. This does not show beyond a reasonable doubt, however, that the jury would not have been persuaded to impose life without parole absent the improper argument. Her penalty phase defense had other components.
The majority states that Gonzales’s mitigation evidence in general “loses much of its persuasive impact” because the murder resulted from terrible forms of child abuse. (Maj. opn., ante, at p. 954.) The question, however, is not how persuasive we find the mitigation evidence to be, but whether there is a reasonable possibility the jury would have found it persuasive absent the improper appeal to passion. I do not believe we can say with any confidence that there is not.
For example, the majority concludes that the evidence that Gonzales was herself abused as a child “paled in comparison” with the crime of which she was convicted (maj. opn., ante, at p. 954), so it too has little persuasive impact. It is reasonably possible, however, that the jury would have found otherwise absent the prosecutor’s improper appeal to passion. A major theme on which the prosecution relied, of course, was the horror of child abuse. *964 There is little doubt that the prosecution was keenly aware that this theme could be turned against it in the penalty phase because Gonzales also was an abused child. The prosecutor’s recognition of the possible impact of this evidence is apparent in his effort to undermine it by making the novel assertion that Gonzales’s history as an abused child somehow proved she was the actual killer. He said, “ ‘[o]ne other thing that proves she did it, and that’s her child abuse history. She learned, she was schooled in terror. . . . She has a Ph.D. in child abuse.’ ” (Maj. opn., ante, at p. 954.)
The prosecutor evidently did not believe that the abuse Gonzales suffered as a child was comparatively insignificant, for he went to considerable rhetorical lengths in trying to neutralize its effect on the jury. In fact, his strategy was emphatically not to minimize the abuse she suffered—this must have seemed to him unlikely to persuade—but to magnify it and turn it against her. Absent the improper appeal to passion, the jury might have been moved to mercy by the evidence of Gonzales’s childhood suffering while at the same time rejecting the prosecution’s unusual contention that this suffering increased her culpability.
In summary, I fear that holding that the prosecutor’s improper argument was harmless in this case establishes a new low bar for harmless error on the issue of appealing to passion in penalty phase closing arguments. The law intends to make it relatively difficult for the prosecution to show harmless error when the prosecutor improperly appeals to emotion in the penalty phase of a capital trial. This is why the legal standard of review requires a mere reasonable possibility of prejudice in order to reverse a verdict of death. It is, in my opinion, essential for the court to ensure that the rule has some teeth and will be enforced. Otherwise, overly zealous prosecutors may be incentivized to push the limits without serious fear of reversal. I believe the death penalty verdict should be reversed.
Appellant’s petition for a rehearing was denied August 10, 2011, and the opinion was modified to read as printed above.

Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6, of the California Constitution.